## Wilma A. BISHOP v. Charles G. BISHOP

5-5872                                          480 S.W. 2d 145

Opinion delivered May 15, 1972

*Branscum, Schmidt & Mazzanti,* for appellant.

*Spitzberg, Mitchell & Hays,* for appellee.

J. Fred Jones, Justice. This is an appeal by Wilma A. Bishop from a divorce decree rendered in favor of Charles G. Bishop upon his complaint against her in the Pulaski County Chancery Court.

According to the pleadings and evidence of record, the parties were married in 1951 following their courtship while married to their former spouses, and on the same day, or in the day following, Mr. Bishop's divorce from his former spouse. The serenity of Mr. and Mrs. Bishop's marriage to each other was interrupted by turbulent epi-

sodes which increased in number and severity until finally on May 1, 1968, they separated and have not lived together since that date. The Bishops had three children, a daughter 18 years of age and married; a daughter 17 years of age and in college, and a son 15 years of age. The children continued to live with their father following the separation and the two younger children were living with him at the time the present suit was instituted.

Mrs. Bishop filed suit for divorce in July, 1968, and Mr. Bishop apparently filed a counterclaim. The counterclaim is not in the record but the complaint simply alleged general indignities, not specifically set out. The chancellor denied a divorce to either party in that case under a finding that the evidence as to the alleged grounds for divorce did not preponderate in favor of either party. In that case the chancellor awarded a continuance of $300 per month maintenance money previously awarded to Mrs. Bishop.

The present action was filed by Mr. Bishop on August 31, 1970, alleging indignities occurring both prior and subsequent to May 1, 1968, and also alleging that Mrs. Bishop had not lived with him since deserting him without cause on May 1, 1968. Mrs. Bishop filed an answer and counterclaim in which she denied the allegations contained in the complaint and in which she alleged indignities on the part of Mr. Bishop. She prayed for continuation and increase in separate maintenance. On July 9, 1971, she amended her complaint and in addition to separate maintenance she prayed in the alternative, that should a divorce be granted, it be granted to her together with an award of her property rights. On August 3, 1971, Mr. Bishop, by leave of the court, amended his complaint specifically alleging three years' separation.

The chancellor found that Mr. and Mrs. Bishop had intentionally lived separate and apart without cohabitation for three years. He found that in addition to the three years' separation as ground for a divorce to either party, Mr. Bishop had also established additional grounds for divorce but he awarded the decree to Mr. Bishop because he in effect found, that Mr. Bishop was the injured party

and Mrs. Bishop was not entitled to the statutory property award to which she would have been entitled had the divorce been granted to her and Mr. Bishop had not been the injured party. The chancellor found, however, that Mr. Bishop had withdrawn the sum of $12,000 from a joint checking account in a bank and he ordered Mr. Bishop to restore to Mrs. Bishop one-half of this amount in the sum of $6,000. The chancellor directed that Mr. Bishop continue to manage and collect rents on certain rental property held by the parties as an estate by the entirety and to remit to Mrs. Bishop one-half of the net rental income from the property. The chancellor also awarded $200 per month to be paid as alimony to Mrs. Bishop, said payments to continue during her life or until her remarriage or further orders of the court.

On appeal to this court Mrs. Bishop designated the points she relies on for reversal as follows:

"1

Where in a previous hearing for divorce the Court finds neither party is entitled to a divorce, and enters a decree for separate maintenance, subsequent trial of divorce for purposes of finding fault should consider only issues occurring subsequent to the decree of separate maintenance as all previous issues as to fault are res judicata.

2

The Court's failure to award the wife the divorce and an equitable property settlement was against the preponderance of the evidence and an abuse of discretion.

3

Plaintiff's testimony about a majority of the issues was uncorroborated except for the testimony of two of the three children who were obviously biased and prejudiced against their mother.

4

Failure of the Court to order a master to determine the value of the husband's property previous to de-

creeing a property settlement where extensive commercial property is involved and the wife is not financially able to hire appraisers, constitutes an abuse of discretion.

5

Causing a warrant for arrest to be issued as the only new grounds for divorce, where the Court in a previous decree had found neither party entitled to a divorce, is not sufficient to deprive the wife, who has raised three children to near maturity, of a reasonable and equitable property settlement."

The conclusion we reach on the first point also disposes of the last two.

### Point 1

When both parties were denied a divorce in 1968, they had only been separated approximately two months and the three years' separation was not a ground alleged or relied on by either party. The fifth statutory ground for divorce as set out in Ark. Stat. Ann. § 34-1202 (Supp. 1971) provides that a divorce may be granted where either party "shall offer such indignities to the person of the other as shall render his or her condition intolerable." This was the ground alleged in the 1968 action and it was on this alleged ground that the chancellor found the evidence did not preponderate in favor of either party. The question before the chancellor in that case was which of the parties, if either, offered such indignities to the person of the other as to *render his or her condition intolerable*. The chancellor in that case, unlike the chancellor in the case at bar, was not concerned with the question of who was the *injured party*, under the seventh statutory ground for divorce in § 34-1202 which is as follows:

"Where either husband or wife have lived separate and apart from the other for three (3) consecutive years, without cohabitation, the court shall grant an absolute decree of divorce at the suit of either party, whether such separation was the voluntary act or by the mutual consent of the parties and the question of

who is the injured party shall be considered only in cases wherein by the pleadings the wife seeks either alimony under Section 34-1211, Arkansas Statutes 1947, or a division of property under Section 34-1214, Arkansas Statutes 1947, as hereby amended, or both."

The case of *Narisi* v. *Narisi,* 233 Ark. 525, 345 S.W. 2d 620, contained facts almost on all fours with those in the case at bar and our decision in that case was adverse to Mrs. Bishop's contentions under her first point here. We do not belabor this opinion by extensive quotes from *Narisi* but in that case we held that evidence found insufficient for the granting of a divorce on grounds of indignities is not res judicata when offered in proof as to who is the injured party for the purpose of determining property rights between the same parties in a subsequent divorce action based on three years' separation. In concluding the opinion in *Narisi* we said:

"In view of all of the foregoing, there can be no doubt that the Trial Court in the first instance, and this Court on appeal, possesses broad powers, not only as to alimony, but as to property rights, when the divorce is granted to either party under the seventh subdivision of § 34-1202, Ark. Stats. * * *

. . . [W]e have reviewed the entire record in this case, along with Mrs. Narisi's offer to prove, *and also the entire record in the first Narisi case.* We have concluded that the allowances made by the Chancery Court for Mrs. Narisi are fair and just under all of the circumstances existing." (Emphasis added).

We conclude, therefore, that Mrs. Bishop's first point is without merit.

### Point 2

Mr. Bishop owned and operated a service station and it appears from the record that Mrs. Bishop had a considerable appetite and capacity for beer and a considerable doubt as to Mr. Bishop's fidelity to his marriage vows. The

record also indicates that Mr. Bishop went to extreme measures, at least on one occasion, in attempting to force Mrs. Bishop to return to their home and live with him. In her testimony Mrs. Bishop summed up her version of their difficulty as follows:

"Q. . . . explain some of the problems that you and Mr. Bishop were having prior to your separation.

A. Well, all I can say is one word. Women."

Mrs. Bishop testified that her husband operated a service station and would never come home until late, and that she had seen him with other women. She said that she never could get him home on time for meals and when he did get home he would accuse her of nagging. She said that Mr. Bishop's work at the service station required him to work late, but that when she would call the service station he was never there. She testified that soon after she and Mr. Bishop were married he got drunk one night and bragged about the women he had been to bed with. She said she didn't know when these affairs took place but they occurred after Mr. Bishop was married to his first wife. Mrs. Bishop then testified, in part, as follows:

"Q. All right. Now, getting on up to the date that you actually separated, the night. Would you tell us what happened, Mrs. Bishop?

A. Well, he was late coming in from the station, and I had called over there and he admitted this to me. He wanted me to understand that he had taken this woman home. His idea was that he visited her father and it was about eleven o'clock when he came in, and we got into quite an argument , and I asked him to leave, and he started, and Brenda said, 'Well, if he goes'—she was crying—she said 'If he goes I am going.' * * * So, he said he wasn't going anywhere. That is all he wanted, was for me to say that, and I said, 'Well, if you don't, then I will,' and I did, and I drove—got into the car and took a few things, and drove down to my sister's, got down there on May the first, around six o'clock.

Q. Now, where does she live?

A. She lived in Pineville, Louisiana."

Mrs. Bishop testified that when she went to her sister's home in Louisiana, she did not want Mr. Bishop to know where she was because he had threatened to kill her on many occasions and she was afraid of him. She testified that within about a month she returned to Little Rock and rented an apartment near the service station Mr. Bishop operated. She said that her sister and her mother and a friend, Mrs. Houchin, knew where she was living at that time; that she talked to her children by telephone but did not give them her telephone number or address because she was afraid Mr. Bishop would find out where she was and she did not want him to find her. She said that she obtained a job and worked for approximately six weeks and that Mr. Bishop learned where she lived through an automobile agency in Searcy where she had purchased an automobile and that Mr. Bishop and their son came over to where she was living. She said that Mr. Bishop whispered to her out of the hearing of their son that she would be sorry for her actions and that on the following day, which was sometime in October or November following their separation in May, he came to her apartment and she then testified as follows:

"... he burst in the door and started beating me and said that I had bought a tank of gasoline for a man in Bald Knob, and I tried to reason with him, and I couldn't. He tried to smother me. He choked me. He did everything there was to do, and I finally knew that he was going to kill me, so I just agreed to go with him. He said, 'You are going back over there and raise those children, so I agreed to go with him, and I said, 'The girls and I will come back and I will move this stuff.' "

Mrs. Bishop testified that following this incident she filed her original suit for divorce and she offered in evidence some photographs which had been placed in evidence at the original trial, showing bruises on her face and arms caused by her altercation with Mr. Bishop on this occa-

sion. She testified that after this confrontation with Mr. Bishop she agreed to return home and did so, she then continued her testimony as follows:

"Someone, he or Mary one, took the stuff out of my car or his, and just piled it in the kitchen floor, so when he got—he left, and I didn't know where he was and I called the station and they said he just left, and about that time he came in, and when he came in, I said, 'If you don't want people to see your handiwork,' I said, 'Go get me some beer.' I wasn't going— I didn't know where he was—

Q. Where were you at this time?

A. We were back at 6012 Mablevale.

* * *

. . . so he left and got some beer and came back and opened it, and I was drinking a diet cola. I told him I didn't want it, so he picked up my drink and drank that, and then I got the beer and put it back in the refrigerator and didn't touch it. When he left I called Mrs. Houchin, and told them what happened, and they came over and got me, or I followed them back to their house.

* * *

Q. Well, now, what happened?

A. He found out from the children that I wasn't there, so he reached over and—he said that in his testimony —he reached over and got his guns and came down there with two loaded guns.

* * *

Q. Mrs. Bishop, you were at the Houchins now?

A. Yes. I was at the Houchins, is what I am telling now. He came down there with two loaded guns, a

forty-five and a thrity-eight, and he wanted me to come out of the house, and Mr. Houchin told him that I didn't want to go, and Elmo had gotten his gun out and just left it standing, and I picked it up and took it to—the gun to Elmo. He is a small man and Charlie could easily overpowered him, but he knew that he could use the gun, so he didn't attempt to. He just stood there with this loaded gun, and in the meantime we had tried to get an Order for his arrest or whatever you call it, and the office of the District Attorney's office was closed, so when he appeared we called the police and they came out and it was one of his friends, and by that time Dorothy had gone around and persuaded him to unload the guns, and the guns were unloaded when the police got there."

Mrs. Bishop then testified as to displays of affection between Mr. Bishop and his niece. She said that she and Mr. Bishop had the sum of $12,000 in a joint bank account and that Mr. Bishop drew it out. She testified that Mr. Bishop's former wife had been previously married and her husband was killed by a burglar. She testified that Mr. Bishop, among others, had been questioned in connection with the matter and on cross-examination Mrs. Bishop testified that Mr. Bishop had told her he was taken in and questioned in the matter and then Mrs. Bishop testified as follows:

"Q. How many times, on the basis of that knowledge, Mrs. Bishop, have you told your children that their father was a murderer?

A. I did not tell 'em until, oh, recently. Recent years, I think.

Q. Well, how many times before you separated from him in 1968 did you make that statement to them?

A. I don't recall. I may have told them one time, but I don't recall everything I told—any—

Q. And, it based on—? Excuse me.

A. —any more than—They have not been told very many times.

Q. But, it was based on the same information you have given about it, that you have given the Court?

A. Well, I looked it up in the paper.

Q. All right. Now, why would you tell the children; that is Mr. Bishop's children, is that right?

A. They are our children.

Q. Yes. Why would you tell his children and your children that their father was a murderer?

A. Well, the stories that he was going around telling on me.

Q. What was he telling on you?

A. He was telling that I was an alcoholic, and that I was running around and I was crazy, and he told— and he was telling—

Q. Who was he telling these things to?

A. Neighbors and friends.

Q. But, you told his children that he was a murderer; is that right, in retaliation?

A. I told them exactly what I said here, that they were taken in, he and Irene were.

Q. But, did you tell the children, actually use the term 'murderer' in talking to your children?

A. I probably did.

Q. And, you did that in retaliation, you say, for Mr. Bishop's telling neighbors and friends that you were an alcoholic and you were crazy; is that right?

A. No, it wasn't in retaliation. I just—

Q. I thought you said it was because—

A. I thought they should know it.

Q. Why did you think they should know?

A. So they would know what kind of man he is.

Q. Their father?

A. Yes."

On cross-examination Mrs. Bishop testified that on May 1 when she and Mr. Bishop separated he got home around 11 0'clock at night and when she inquired where he had been, he told her that a friend's daughter had left an automobile at the service station to be repaired; that he had taken the daughter home and had visited awhile with her father who had just returned from the hospital following an operation. She said she checked out his story and it was not true. Mrs. Bishop also testified that after she left Mr. Bishop he employed a divorcee as a housekeeper; that she lived in the home with Mr. Bishop and the children and on one occasion Mr. Bishop took her on a hunting trip.

Mr. Bishop testified that his and Mrs. Bishop's marital difficulties were caused by her drinking beer to excess and unjustly accusing him of chasing around with other women. He testified that Mrs. Bishop consumed approximately 18 cans of beer a day and on different occasions would call him at the service station where he worked and request him to come home and bring beer. He testified that Mrs. Bishop constantly and falsely accused him of having affairs with other women and as to the occurrence on the date of their spearation Mr. Bishop testified that about 8:30 a daughter of a friend of his brought a pickup truck into his service station to have some work done and that he suggested to her she leave it to be worked on the following day and that he agreed to drive the young lady home. He said that he did drive

her home and visited awhile with her father who was ill and had just returned from the hospital. He said that he went home about 10 o'clock and when he got there, he could tell that Mrs. Bishop was angry and that after he went to bed she raised up on one elbow and he then testified as follows:

"... she raised up on one elbow, and said, 'who in the H--- were you out with tonight?' I said, 'Oh, mother, I been working hard.' I said, 'Please don't start that stuff again,' and she said, 'Don't give me that,' and she hauled off and kicked me like a kangaroo with both feet, and tried to kick me out of the bed almost and struck back like that with my arm. I knocked her feet back just like that and I said, 'I don't do that.' And, she said, 'Why in the — don't you get out of here and get a divorce?''

Mr. Bishop then testified that Mrs. Bishop left him and that he begged her on numerous occasions to return. Mr. Bishop denied that Mrs. Bishop had any cause to accuse him of infidelity and while he admitted that he had employed a housekeeper who lived in the home after Mrs. Bishop left, and while he admits he took the housekeeper with him on a camp-hunting trip, he said that the housekeeper had her own separate room in the home and he denies any impropriety in the setup.

This is by no means the full extent of the testimony adduced at the trial but it is more than enough to show its general tenor, and is enough in our opinion, to show that the chancellor did not abuse his discretion as alleged by Mrs. Bishop under her second point.

## Point 3

Two of the Bishop children testified to the effect that the difficulty between their parents was occasioned by Mrs. Bishop drinking beer; flying into temper tantrums and accusing Mr. Bishop of being out with some woman when he would come home late from the service station he operated. There is no evidence of collusion in this case and we find no merit in the third assignment of error.

## Point 4

The evidence indicated that Mr. Bishop receives a salary of $10,000[1] and that he owns some rental property bringing in approximately $16,000 gross in rents annually. One piece of this property is owned jointly by Mr. and Mrs. Bishop and accounts for approximately $2,700 of the annual gross rental income. The full extent and nature of the property was before the chancellor when he awarded to Mrs. Bishop one-half of the $12,000 deposited in their joint checking account and one-half of the rental income from the jointly owned property, and we are unable to say that the chancellor abused his discretion in not inquiring farther into the exact market value of the property owned by Mr. Bishop. In the light of out holding on Point 1, *supra,* we find it unnecessary to discuss Point 5.

From the overall evidence in this case we are unable to say that the chancellor's finding that Mr. Bishop was the injured party is against the preponderance of the evidence; and we are unable to say that the chancellor abused his discretion in the awards made to Mrs. Bishop in the decree.

The decree is affirmed.

---

[1] Mr. Bishop sold the service station during the separation and was on a salary at time of trial.